The question therefore is whether they have done so. We think they have.

Certainly the widow, who had a half interest in the mortgaged property, and was undoubtedly liable upon the note to the extent of her interest in the community property, had a right to bind herself and her property by reissuing the note and reviving the mortgage; and were she sole heir of her husband the question would end right here; for her act in reissuing the note was the act of her husband himself, to the extent of her interest in the property left by her husband.

But we do not think she could thus bind her minor children and the property inherited by them. However we think the children have *ratified* her act since coming of age or being emancipated. For on October 25, 1923, when one of said children was of age and the other two duly emancipated, and when said note was about to prescribe and the bank was pressing its claims, demanding either that its claims be paid or that said note be extended, the widow and her three children, accompanied by their counsel, voluntarily acknowledged and promised to pay said note, and extended the payment thereof. It is clear that they all knew very well just what they were doing, and under what circumstances; for, as we have said, they were accompanied by counsel. And there is no suggestion, either here or when they were sued by the bank, that their act in acknowl-

edging and renewing the note of April 3, 1918, was not entirely voluntary and done with full knowledge of all circumstances.

### V

It will be observed that the note of April 3, 1917, was reissued and the reissuance ratified (October 25, 1923) long before the property was mortgaged to plaintiff (May 13, 1925).

We are therefore of opinion that the bank's mortgage, under which the property was sold, was in full force and effect when the property was sold, and that said mortgage primed the mortgage held by plaintiff; and, accordingly, we think the trial judge correctly rejected the demands of the plaintiff.

### Decree

The judgment appealed from is therefore affirmed.

THOMPSON, J., takes no part.

**(121 So. 604)**

**No. 29727.**

### MEYER v. STATE.

Feb. 25, 1929. Rehearing Denied March 25, 1929.

Percy Saint, Atty. Gen., Woods Thompson, Asst. Atty. Gen., and Bertrand I. Cahn, City Atty., and Francis P. Burns, Asst. City Atty., both of New Orleans, for the State.

William Winans Wall and Lemle, Moreno & Lemle, all of New Orleans, for appellee.

LAND, J. In the year 1915, Henriques & Wall, attorneys at law, were employed by the school boards of the parishes of Jefferson and of Orleans, under the provisions of Act 158 of 1910, to recover for the state section 16, township 12 south, range 11 east, S. E. district of Louisiana, east of the Mississippi. This township lies in both of these parishes. A part of the land was recovered, and all costs were paid by the attorneys. State v. New Orleans Land Co., 143 La. 858, 79 So. 515; Brott v. New Orleans Land Co., 151 La. 134, 91 So. 653.

If the contracts made are valid, the attorneys employed by the school boards became the owners of one-fourth interest in the land recovered by them for the state, amounting to 50 or 60 acres. This interest was conveyed to the plaintiff, who has instituted the present proceedings under Act 184 of 1928 for a partition by licitation between the state and himself, as transferee of Henriques & Wall.

The state, through its school boards, attacks the constitutionality of both Act 158 of 1910 and Act 184 of 1928, on the ground that they are in contravention of the Act of Congress of February 15, 1843, c. 33, 5 U. S. Statutes at Large, p. 600, and also of the provisions of the Constitution of the United States (article 4, § 3, cl. 2, and article 6, cl. 2), which declare that Congress shall have the power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States, and that the Constitution and laws of the United States are the supreme law of the land.

The judgment of the lower court recognized plaintiff and the state, the defendant, to be the owners in indivision of the property sought to be partitioned, in the proportions of one-fourth to plaintiff and three-fourths to the state, decreed a partition by licitation, and referred the parties to a notary public for the purpose of completing the partition.

From this judgment the state has appealed.

Article V of defendant's answer is as follows:

"For further answer to plaintiff's petition, defendant avers that the land in controversy forms a part of fractional section 16, 'in place,' according to the rectangular method of survey adopted by the United States, in township 12 S., R. 11 E., S. E. district of Louisiana, east of the Mississippi river, which was reserved to the inhabitants of said township for the support of schools within the same, in accordance with the Acts of Congress of April 21, 1806, c. 39 (U. S. Stat. at L. vol. 2, p. 391), and March 3, 1811, c. 46 (U. S. Stat. at L. vol. 2, p. 662), and was first officially surveyed in

1871–72 for the Land Department of the federal government by Valery Sulakowski, under contract with the United States, and which survey was officially approved by E. W. Foster, Surveyor General, acting for the United States, on October 20, 1873."

Plaintiff contends that, even if Act 158 of 1910 is in conflict with the Act of Congress of February 15, 1843, the state act is paramount, since Congress had parted with title to the sixteenth section lands in 1806 and 1811, and therefore had no power in 1843 to pass an act authorizing the Legislatures of the states of Illinois, Arkansas, Louisiana, and Tennessee to sell lands "heretofore appropriated for the use of schools in those states," nor to provide in said act that "said lands, or any part thereof, shall in no wise be sold without the consent of the inhabitants of such township to be obtained in such manner as the Legislatures of said states shall by law direct."

Defendant, on the other hand, asserts that the acts of Congress, which reserved section 16 of each township of the state of Louisiana for support of schools within the same, were not grants in præsenti; that the legal title of the state did not become effective until an official survey was made by the federal government; and that the act of Congress of 1843 is paramount on the subject.

Act 158 of 1910 authorized school boards throughout the state to employ attorneys, on a contingent fee not to exceed 25 per cent. of the amount recovered, to institute suits in the name of the state to secure the sixteenth sections where they were claimed by other parties.

Act 184 of 1928 authorizes suits against the state to effect judicial partitions of lands recovered by attorneys on a contingent fee basis, as authorized by Act 158 of 1910, and gives to the transferees of the attorneys employed the same right of action.

Defendant contends that both of these acts are in conflict with the act of Congress of 1843, which provides that the lands appropriated by Congress to the use of schools "shall in no wise be sold without the consent of the inhabitants of the township or district" in which they are located, since the state acts in question authorize the disposition of the lands, without the consent of the inhabitants of the township, by paying attorneys a contingent fee not to exceed 25 per cent. of the land recovered by them, and also by providing for judicial sales in order to effect partitions of same by licitation.

■ Even if it be conceded that the acts of Congress of 1806 and 1811 were not grants in præsenti, it is admitted in the answer of the state that the sixteenth section in dispute was surveyed in 1871–72, and that this survey was officially approved October 20, 1873. It is well settled that: "Until the status of the lands was fixed by a survey, and they were capable of identification, Congress reserved absolute power over them; and if, in exercising it, the whole or any part of a sixteenth or thirty-sixth section had been disposed of, the state was to be compensated by other lands equal in quantity, and as near as may be in quality." Heydenfeldt v. Daney Gold & S. Min. Co., 93 U. S. 634, 23 L. Ed. 995; United States v. Morrison, 240 U. S. 192, 36 S. Ct. 326, 60 L. Ed. 599.

As declared in United States v. Morrison, supra: "But Congress used the same phrase substantially in nearly every one of the school grants, and it was the manifest intention to place the states on the same footing in this matter. The same clause, relating to the same subject, and enacted in pursuance of the same policy, did not have one meaning in one grant and a different meaning in another; it covered other dispositions, whether prior or subsequent, if made before the land had been appropriately identified by survey and title had passed." Page 206 of 240 U. S. (36 S. Ct. 331).

It follows necessarily that the state of Louisiana took title to the property in dispute after the approval of the official survey of October 20, 1873.

Since at that date a complete legal title vested in the state, she was no longer bound by the conditions and limitations hitherto placed by the act of Congress of 1843 upon the disposition by her of the sixteenth section in controversy, nor by the statutes of the state enacted thereunder to obtain the consent of the inhabitants of the township or district to a sale of the land at an election duly held. Act 321 of 1855, §§ 31, 32, 33, and 34; Revised Statutes of 1870, §§ 2957, 2958, 2959, and 2960.

As far as the future disposition of this sixteenth section, after · October 20, 1873, is concerned, the state was dealing exclusively with her own property, and was free to pass Act 158 of 1910 and Act 184 of 1928, providing for its recovery upon the basis of a contingent fee, and also for its partition by judicial sale. Wilcox v. Jackson, 13 Pet. 498, 10 L. Ed. 264; Lott v. Prudhomme, 3 Rob. 293.

In State v. New Orleans Land Co., 143 La. 858, 79 So. 515, in which the state recovered the property, it is stated: "The said township was surveyed officially, and the survey approved, in 1872." Page 861 of 143 La. (79 So. 517). It is also announced in the opinion in that case: "Inherent in the state's title to such school land is a condition imposed by the act of Congress (Act Feb. 15, 1843, c. 33, 5 Stat. at L. p. 600) that the state cannot alienate same without the consent of the inhabitants of the township in which the land is situated." Page 867 of 143 La. (79 So. 519).

In Cooper v. Roberts, 18 How. 173, 15 L. Ed. 338, it is held that, as the government extended its surveys, so that the location of these sixteenth sections was ascertained, the title in the state of Michigan became complete.

On page 181 of the opinion in the Cooper Case it is said: "The defendant insists that the title of the plaintiff is invalid, for the reason that the state of Michigan was not empowered by Congress to sell the school reservations. Where such grants have been made to the state, or to the inhabitants of the township, for the use of schools, it has been usual for Congress to authorize the sale of the lands, if the state should desire it. 4 Stats. at Large, 138, 237, 298; 5 Stat. 600. But this consent was not, perhaps, necessary, and the application for it is but evidence of the strong desire of the state authorities to act in good faith, and to keep within the pale of the law. [Long & Long v. Brown], 4 Ala. 622."

"The trusts created by these compacts relate to a subject certainly of universal interest, but of municipal concern, over which the power of the state is plenary and exclusive. In the present instance, the grant is to the state directly, without limitation of its power, though there is a sacred obligation imposed on its public faith. We think it was competent to Michigan to sell the school reservations without the consent of Congress."

In United States v. Morrison, 240 U. S. 203, 36 S. Ct. 330, 60 L. Ed. 605, it is said: "In Cooper v. Roberts, supra, the plaintiff asserted title under the school grant made to Michigan (Act of June 23, 1836, 5 Stat. at L. 59, c. 121). The section 16 in controversy had been surveyed in 1847. Sale had been made by the state in February, 1851, and its patent had issued in November of that year. It was in 1850, after the lands had been surveyed, that the defendant's grantor had applied to the officers of the land office to enter the land, and the entry was allowed in 1852, with a reservation of the rights of Michigan, which the Secretary of the Interior deemed to be superior. It was in these circumstances, it being found that there was no legal impediment through any legislation,

that the court held that the title had passed to the state."

It is clear, therefore, regardless of anything that may have been said to the contrary in State v. New Orleans Land Co., 143 La. 858, 79 So. 515, that a complete legal title vested in the state of Louisiana after the survey of 1871–72 and its official approval in 1873, and that the Act of Congress of February 15, 1843, was no legal impediment to the subsequent passage by the state Legislature of Acts 158 of 1910 and Act 184 of 1928, which are constitutional and valid.

Judgment affirmed.

O'NIELL, C. J., concurs in the decree.