Dear Mr. Hardy:
On behalf of the St. Martin Parish School Board, you have asked several questions related to the sale or lease of sixteenth section lands. Specifically, you asked the following four questions:
 1. Was it legal for the State or anyone else to sell or lease Section 16 Lands in St. Martin Parish without the authority of the school board?
 2. If such sales were illegal, is there any prescription which would limit how many years the School Board could go back to try and sue and reclaim its property or revenue?
 3. Is there anything in the United States Constitution or Federal Law which would supercede the Louisiana Law and allow the School Board to reclaim unauthorized sales or leases of Section 16 properties by the State of Louisiana or anyone else?
 4. If so, is there any prescription or statute of limitations which would limit how far back the School Board could go to sue to reclaim its property or revenue?
Although sixteenth section lands exist in every state of the nation, the laws controlling each state's sixteenth section lands may be significantly different from one state to another. This reality requires the specific review of the federal law that granted these lands to Louisiana that is contained herein.Papasan v. Allain, 106 S.Ct. 2932, FN 18 (1986). As you already know, the sixteenth section lands constitute part of a surveyed rectangular portion of land, based on a system of survey implemented in 1784-1785 by the Second Continental Congress. "Congress reserved and dedicated the sixteen [sic] section in each township for the support of public schools." La. Atty. Gen. Op. 96-188.
As to your first question of the legality of the sale or lease of sixteenth section lands, the State retains ownership, in trust, over these lands as lands for the public (school board) use in its public capacity. The lands are administered through the State Lands Office. The local school boards are only given custodial authority over the lands and not actual ownership. See La. Atty. Gen. Op. 96-188. The sale of sixteenth section lands has been legal in Louisiana since April 30, 1812, the date of Louisiana's admission to the Union as the eighteenth state.
In 1806, the United States Congress, in "An Act Supplementary to an Act Intituled [sic: should be "Entitled"] `An Act for Ascertaining and Adjusting the Titles and Claims to Land, Within the Territory of Orleans, and the District of Louisiana,'" stated that ". . . the section `number sixteen,' . . . shall be reserved in each township for the support of schools within the same." 2 Stat. 391, Sec. 11. This reservation of sixteenth section lands was reaffirmed by Congress with the same language in 1811 in "An Act Providing for the Final Adjustment of Claims to Lands, and for the Sale of Public Lands in the Territories of Orleans and Louisiana, and to Repeal the Act Passed for the Same Purpose, and Approved February Sixteenth, One Thousand Eight Hundred and Eleven." 2 Stat. 662, Sec. 10. These reserved lands vested in the State upon statehood in 1812. John L. Madden,Federal and State Lands in Louisiana 232 (Claitor's Publishing Division 1973); La. Atty. Gen. Op. 96-188. There has been some debate as to what interest was actually transferred to the State by the 1806 Act. However, following a series of United States Supreme Court rulings on the nature of certain sixteenth section land grants, it is clear that this grant was intended to give the State a fee simple interest in the sixteenth sections. SeePapasan, 106 S.Ct. at 2941-2; State of Alabama v. Schmidt,34 S.Ct. 301, 302 (1914); Cooper v. Roberts, 18 How. 173, 182 (1855). This interest becomes acutely obvious under Papasan,
which found the same fee simple classification existed in Mississippi. See also Holmes S. Adams, et al., School Law in Jeffrey Jackson and Mary Miller, eds., Encyclopedia ofMississippi Law § 65 (West 2004). Although that same case cautions that the law affecting each state's sixteenth section lands must be interpreted in light of the unique federal statute granting that land, and despite the fact that Mississippi and Louisiana were granted their sixteenth section lands in different acts of Congress, the virtually identical language of these grants requires a convergent interpretation of the law as it applies to Louisiana and Mississippi sixteenth section land. SeePapasan, 106 S.Ct. at FN 18; 2 Stat. 391, Sec. 11; 3 Stat. 375, Sec. 3. Thus it is clear that Louisiana, like its eastern neighbor, received a fee simple interest in its sixteenth section lands when those lands vested in the State in 1812. This absolute (or fee simple) grant of sixteenth section lands is supported byState of Louisiana v. Joyce, 261 F. 128, 132 (5th Cir. 1919), cert. denied, 253 U.S. 484 (1920), stating that "[t]hose lands were unequivocally and unconditionally appropriated to a purpose for the carrying out of which the future state alone was looked to." Additionally, the Joyce court goes on to state that, ". . . though such states were in honor bound to apply [the lands] to the purpose for which they were given, the validity of sales of them by the states is not dependent upon a compliance with a qualified permission to sell given by Congress after the lands had ceased to belong to the United States." Id. at 133.
Despite the State's fee simple interest, in 1843, the United States Congress passed "An Act to Authorize the Legislatures of the States of Illinois, Arkansas, Louisiana,
and Tennessee, to Sell the Lands Heretofore Appropriated for the Use of Schools in those States" (hereinafter, "the Act"). 5 Stat. 600
(emphasis added). The Act recognized that the ownership, and thus the ability to sell sixteenth section lands, was retained by the states and did not fall to the various political subdivisions that may actually care for the lands and administer the schools. This is evident in the statement that "the Legislatures of . . . Louisiana . . . are hereby, authorized to provide by law for the sale and conveyance in fee simple, of all or any part of the lands heretofore reserved and appropriated by Congress for the use of schools within said States . . ." Id. However, based upon the foregoing analysis, it is the opinion of this office that, to the extent that the 1843 Act purports to grant Louisiana the power to sell its sixteenth section lands, that Act is superfluous, as such power vested in the State by virtue of the fee simple grant of these same lands when the sixteenth section lands vested in the State in 1812. While the Fifth Circuit in Joyce, supra, does not expressly mention this, it seems to strongly imply that Congress recognized that its 1843 Act was not necessary in order for the State to have authority to sell the lands at issue (i.e., sixteenth sections) which they already owned in fee simple absolute when it ended its Act with the proviso, ". . . so far as the assent of the United States may be necessary to the confirmation thereof [i.e., sales of sixteenth sections lands]" (emphasis added). This is evidenced by the fact that the Court went to the trouble of quoting Section 4 of the 1843 Act, the "confirmation as may be necessary" clause, and by the following language from its decision in Joyce, viz:
 [The] state having been destined, from the time the territory included in it was acquired by the United States, to have exclusive and plenary power over the schools for the support of which those Sixteenth Sections were set apart (Alabama v. Schmidt [supra]) . . .
 The terms of the act of February 15, 1843, indicate that in enacting it Congress assumed that previously there had been consummated appropriations of the sixteenth sections for the use of schools within the states mentioned, and
that, notwithstanding such prior disposition of these sections, it remained in the power of Congress to determine the method to be pursued by those states in disposing of their school lands. The former assumption is inconsistent with the latter one. The consummated gifts of the school lands to the states being absolute . . . [t]he sales by the state of the land sued for being questioned only on the ground that such sales were not made in the manner prescribed by the act of February 15, 1843, the attack on the validity of those sales cannot be sustained. The state had the power to sell those lands without the consent of Congress. (Emphasis added.)
Id. at 131 and 133, respectively.
Thus, in our opinion, it is clear that it has been legal for the State of Louisiana to sell sixteenth section lands since 1812. Further, because the local school boards or other relevant political subdivisions have only custodial authority over the lands (as the beneficiaries of the lands held in trust for them by the State as the nominal owner), there is no reason to believe that their permission or authority must be sought prior to a sale of such lands. This is supported by an earlier opinion of this office, which found that the local school boards must seek legislative authority to divest themselves of sixteenth section lands. La. Atty. Gen. Op. 94-234.
However, the authority to sell sixteenth section lands does not rest solely with the State. Pursuant to La. R.S. 41:711, when the State intends to sell sixteenth section lands, the treasurer of the parish in which the lands are situated "shall take the sense of the inhabitants of the township with reference to whether or not any lands heretofore reserved and appropriated by congress for the use of schools shall be sold." Briefly, La. R.S.41:711 outlines the methodology for the treasurer to follow to "take the sense of the inhabitants." This procedure includes holding an election, following advertisement of the intent to sell, with the majority of the inhabitants' votes (i.e., the legal voters) controlling whether or not the sixteenth section lands will be sold. La. Atty. Gen. Op. 1916-18, pp. 446-7.
Louisiana Revised Statute 17:87, paragraph two, appears to conflict with La. R.S. 41:711 when it states that the election for the sale of lands is to be conducted by the parish school board rather than the parish treasurer. However, this discrepancy, which appears to have been an oversight in subsequent statutory updates, is clarified by Atty. Gen. Op. 1916-18, p. 446. This opinion states that, pursuant to Act 120 of 1916, the sale of sixteenth section lands "is taken out of the hands of the Parish Treasurer . . . and placed in the hands of the School Board." Id. Aside from providing the methodology for conducting the election, La. R.S. 41:711 supports the reality that the local school boards are at the mercy of the State and the residents when it comes to the sale of the sixteenth section lands that they administer. However, when such lands are sold by the State, whether purposefully or erroneously, under La. R.S.41:640(B), the school board is entitled to a portion of the sale proceeds or revenues from mineral or timber leases or other activities. The funds remain on deposit with the state treasury and will accrue an interest of four percent per annum. Id.
School boards have "the right to use the said funds in the acquisition, construction, and equipping of public school buildings and other school facilities." Id.
The predial lease of sixteenth section lands presents a different situation from the sale of those same lands. Local school boards are allowed to lease, for surface purposes, sixteenth section lands over which they have custodial authority. La. R.S. 17:87. Leases must be conducted pursuant to a resolution of the board, but the board does not have to seek the consent of the residents to lease in an election such as that required under La. R.S. 41:711 in order to sell its custodial lands. Funds realized by the school board from the lease of sixteenth section lands must be credited to the general school fund of the parish.
It should be noted that the Louisiana Legislature has established special procedures for the granting of mineral leases covering "sixteenth section or school indemnity lands" in La. R.S. 30:151 through 158 (less section 157, which was repealed by Act 292 of 1950). In general, the school board may request and direct the State Mineral Board (SMB) to lease its land, but often the mineral lease is executed by the SMB (the school board administers the lease as lessor as if the lease were granted by it). La. R.S. 30:153. If the school board does not elect to do this, it may advertise for and grant the lease itself. La. R.S.30:154 through 156. In any event, all mineral leases from a school board must be approved by the SMB in order to be valid. Absent such approval by the SMB, the mineral lease "is null and void." La. R.S. 30:158. Please also note that special provisions are made to distinguish between "sixteenth section or school indemnity lands." La. R.S. 30:154(C). The latter must be leased by the SMB and the allocation of the funds in each case are expressly provided for. Id.
The Legislature has also seen fit, on several occasions, to cure past procedural inconsistencies related to the sale of sixteenth section lands. See generally, La. R.S. 41:1321 through41:1323.3. Though not addressed by the Legislature, logic dictates that these ratifications can only go back as far as the time at which the State gained the authority from the United States to sell sixteenth section lands in 1812. In 1934, the Legislature enacted La. R.S. 41:1322, which ratifies and confirms sixteenth section land sales made prior to 1900, "notwithstanding informalities in the sales relative to the appraisement and offering the lands in lots of forty acres, where it is affirmatively shown that the purchase price of the lands has actually been paid to the state treasury . . ." This statute further requires that the officer who made the sale had filed a proces verbal and granted a deed to the purchaser and that the purchaser actually went into possession of the property for the sale to be ratified and confirmed. This statute was clarified, in 1942, by La. R.S. 41:1323, which also applied to sixteenth section land sales made prior to 1900. This statute requires, in addition to the procedural requirements of La. R.S. 41:1322, that in order for the sale prior to 1900 to be ratified, there must also be, in the deed filed by the officer who made the sale, a record of the election in favor of selling the land under La. R.S. 41:711. Additionally, La. R.S. 41:1323 requires that where the deed states that the sale was made for cash payment or on credit, receipt of the cash sale or cancellation of the mortgage shall grant the purchaser the full benefit of the property.
In 1944 (as amended in 1948), the Legislature extended the period for which the sale of sixteenth section lands could be cured of procedural inconsistencies to sales made before 1914. La R.S. 41:1321. This statute largely embodies the same content as the earlier statutes of 1934 and 1942, discussed above. The Legislature later extended these curative mechanisms, via La. R.S. 41:1323.1 through La. R.S. 41:1323.3, to ratify and confirm sixteenth section land sales that had occurred prior to July 1, 1956. Ultimately, the result of these statutes is that, in spite of informalities in the procedure by which sixteenth section lands were sold prior to July 1, 1956, as long as the officer who made the sale made a deed to the purchaser (and in the case of a credit sale, that the mortgage has been cancelled) and recited that an election was made and that formalities were complied with, then any inconsistencies in the procedure for the sale that may have actually existed were cured.
In a departure from the previously discussed statutes regarding the ratification of sixteenth section land sales, the Legislature, in 1978, enacted La. R.S. 41:1323.5. This statute applies only to irregular and fractional sixteenth sections and states that, with respect to this category of lands, only sales made prior to 1860 are cured as to the same procedural defects in the sale as those discussed for La. R.S. 41:1321 through41:1323.3. Because this statute is the most recent treatment of this topic by the Legislature, and because the Legislature saw fit to single out irregular and fractional sixteenth sections, it is apparent that these lands are to be treated differently than other sixteenth section lands. Therefore, it is our opinion that, should there be sixteenth section lands in St. Martin Parish that are irregular or fractional, the school board may seek recompense, through La. R.S. 41:631 et seq., for the sale of those lands that occurred on or subsequent to January 1, 1860, if the procedure for sales of such lands were not properly followed.
Your first question also raises the issue of non-State entities selling sixteenth section lands. It is our opinion that there is only support in the legislation for the State, on its own, or the school board, with a majority vote of the township's legal voter-residents, to sell, through the State of Louisiana, or lease sixteenth section lands. See generally, La. R.S. 41:631
through 41:981. Thus, the discovery of any such sale by a non-State entity should be considered invalid. See generally,Barton's Executrix v. Hempkin, 19 La. 510 (La. 1841). Because private individuals cannot acquisitively prescribe against the State in order to gain ownership of property, absent an express statute waiving sovereign immunity to prescription, there would be no prescription issue were such a scenario discovered. See La. Civ. Code Arts. 450 and 453, comment (c).
Because it is our opinion that the State has had the authority to sell or lease sixteenth section lands since 1812, your question as to matters of prescription on such sales is moot. Also, as was previously mentioned, no one can acquisitively prescribe against the State. La. Const. Art. 9, Sec. 4(B); La. Civ. Code Arts. 450 and 453, cmt. (c). See also, Liner v.Terrebonne Parish School Board, 519 So.2d 777 (App. Cir. 1, 1988); Todd v. State, 474 So.2d 430 (La. 1985); City of NewOrleans v. Magnon, 4 Mart (o.s.) 2, 3 (La. 1815). This means that claims of acquisitive prescription of sixteenth section lands by "squatters" are impossible as such activity is null ab initio. Thus, these lands still belong to the State. Additionally, as to sales of sixteenth section land accomplished post-1812, if the sales are not in compliance with the formal sale requirements found in La. R.S. 41:711 through 41:894, or for the relevant years covered by the curative statutes and their sales requirements, La. R.S. 41:1321 through 1323.3 and 1323.5, (1812 through July 1, 1956 for regular sixteenth sections and 1812 through 1860 for irregular or fractional sections), it is the opinion of this office that these sales are invalid. Because there is no acquisitive prescription against the State and because the State is not subject to the peremptive period in which to bring actions to reclaim its property, there is no "statute of limitations" under which the State is restricted from reclaiming its sixteenth section lands. La. Civ. Code Arts. 450 and 453, cmt. (c);Bruning v. City of New Orleans, 115 So. 733, 737 (on first rehearing, La. 1927); Gulf Oil Corporation v. State MineralBoard et al., 317 So.2d 576, 586-7 (on rehearing, La. 1975). Such suits to reclaim sixteenth section lands may be implemented, on behalf of the State, by the Attorney General under La. R.S.41:921, or by the local school boards under La. R.S. 41:961. See also, State ex rel. Plaquemines Parish School Board v.Plaquemines Parish Government, 652 So.2d 1, 4 (App. 4 Cir. 1995).
Because you also ask if there is any way for the school board to reclaim its property or revenue, we direct your attention to La. R.S. 41:640. This statute provides a mechanism whereby school districts may seek some amount of recompense when they have been erroneously divested of their custodial sixteenth section lands by the State. This statute provides, in pertinent part, that "[w]here sixteenth section lands . . . have been erroneously sold by the state . . . such deficiencies will be properly adjusted . . . and the amounts so determined will be credited to the parish school boards of the parishes in which the townships are situated . . ." La. R.S. 41:640. Additionally, La. R.S. 41:640 states that such "amounts so credited shall be treated as loans to the state on which the state shall pay interest at the rate of four percent per annum." The language of this statute necessarily raises the question of what constitutes an "erroneous" sale by the State. Though no definition of "erroneous" exists in the statute, it is our opinion that "erroneous" refers to a failure to follow the formal requirements for such a sale. Although La. R.S. 41:1321 et seq. cures the errors of form in pre-July 1, 1956 sales of sixteenth section lands, there is no legislation that cures sales for errors of form after July 1, 1956. Thus, if the St. Martin Parish school board were able to demonstrate that an erroneous sale of sixteenth section land was made after July 1, 1956, then the school board should be able to make a claim for a credit, plus interest, from the State for the sale.
With respect to your question as to whether there is any portion of the United States Constitution or any other federal law that would supercede state law on the sale of sixteenth section lands, the answer is no. Indeed, it is the federal law of 1812, and certainly of 1843, referred to above that allows the State to sell these lands. See 2 Stat. 391 and 5 Stat. 600. The United States Constitution, through the Fifth Amendment, does protect against expropriation of property by the State without just compensation and due process of law. However, because the sixteenth section lands are considered to be State property, this provision is inapplicable. It is our opinion that the State is not "taking" school board property in these situations, but rather it is selling its own property, as provided for in5 Stat. 600. Again, these lands are only administered, not owned, by the various school boards of the State. Because we find that the State has not, under state or federal law, deprived the school boards of property to which they have an ownership interest, your last question as to prescription on claims against the sale of such properties is moot. Again, however, it is conceivable that sales of sixteenth section lands prior to the State having authority to do so (prior to 1812) may be challenged as to their validity. However, this would only apply to sixteenth section lands that were sold by the Territory of Orleans (the territorial predecessor to the State of Louisiana) prior to the State gaining such power to sell in 1812. Also, simply because there is no provision under the United States Constitution that supercedes the federal and state law on sixteenth section lands, this does not prevent the local school boards from seeking the funds that are due them from the State for the sale or lease of these lands under La. R.S. 41:640(B).
Based upon the foregoing analysis, it is our opinion that, as to regular in-place sixteenth section lands sold prior to July 1, 1956, as long as the minimal procedural requirements of La. R.S. 1321 through 1323.3 have been satisfied, the sale of these lands by the State have likely been cured by the Legislature. The determination as to whether these sales have been cured is a factual one to be addressed based upon the unique circumstances surrounding the compliance with the requirements of the curative statutes for each sixteenth section. Assuming that these requirements have been complied with, the only sales of sixteenth section lands that a school board may seek to have invalidated for failure to follow proper procedure are those lands that have been sold since July 1, 1956 or before April 30, 1812 (or irregular or fractional sections since 1860) that have not been sold according to the procedural requirements of La. R.S. 41:631
through 41:894.
One important caveat regarding this opinion must be borne in mind: This opinion does not purport to cover sixteenth sections wholly or partially covered by navigable waters. The reason for this caveat is because the determination of rights as to such sixteenth sections is dependant upon each unique factual situation, in which different legal rules to those expressed in this opinion could well apply. This opinion expressly does not cover such sixteenth section lands as they are beyond the scope of your request.
We hope this sufficiently answers your inquiry, however if we may be of further assistance please do not hesitate to contact our office.
Sincerely yours,
 CHARLES C. FOTI, JR. ATTORNEY GENERAL
 RYAN M. SEIDEMANN Assistant Attorney General
CCF, Jr./RMS/AJSJ/CDS, III/tp
OPINION NUMBER 96-188 Douglas L. Hebert, Jr. Attorney General of Louisiana — Opinion. February 24, 1997.
90-B-3(a) PUBLIC LANDS — boundaries; extended ownership 94 SCHOOLS SCHOOL DISTRICTS — administration, government and officers 96 SCHOOLS SCHOOL DISTRICT — physical management, department securities and taxation 97 SCHOOLS SCHOOL DISTRICTS — property, contracts, etc. Civil Code Art. XIII
La. Const. Art. XIII, Sec. 18 R.S. 1:3, 17:87, 41:631-981, 41:717, 41:718, 41:718(A), 41:640
CHARLES C. FOTI, JR., Attorney General.
 Mr. Douglas L. Hebert, Jr. District Attorney Allen Parish P.O. Box 839 Oberlin, LA 70655
Dear Mr. Hebert:
On behalf of the Allen Parish School Board, you have requested our opinion concerning the sale of timber located on sixteenth section land situated solely within Allen Parish. A dilemma arises because the township within which the sixteenth section lies is located in both Allen Parish and Rapides Parish.
You have asked for our opinion on the following issues:
1) Who owns the sixteenth section land?
2) How are funds received from the sale of the timber distributed? Are the funds distributed based on the division of the township (pro rata between the two parishes) or the location of the sixteenth section (all to Allen Parish)?
3) What are the proper procedures for selling timber which is located on sixteenth section land?
4) If the Allen Parish School Board and the Rapides Parish School Board jointly own the sixteenth section land, and the Allen Parish School Board has properly declared the land as surplus, advertised and bid the timber out but Rapides Parish School Board has not, could the Rapides Parish School Board declare it as surplus after the fact and be included with and accept the bid the Allen Parish School Board has received? Asked another way, can the Rapides Parish School Board ratify an improper sale of timber, thereby making the sale valid?
Your first question, determining ownership, requires a look back into the history of sixteenth section lands. The sixteenth section is but part of a surveyed rectangular section of land. More specifically, in 1784-85, the Continental Congress established and initiated a rectangular system to survey public lands. The measured rectangle is the township. It is six miles square and contains 36 sections; the sections are 1 mile square each, or as close as possible to 640 acres.
Congress reserved and dedicated the sixteen section in each township for the support of public schools. An Act of Congress of April 21, 1806 (2 Stat. 391, Chptr 39, § 11) and March 3, 1811 (2 Stat. 662, Chptr 46, § 10) provides as follows:
 That the President of the United States be and he is hereby authorized, whenever he shall think proper, to direct that so much of the public land lying within the territory of Louisiana, as shall have been surveyed in conformity with the eighth section of this act, be offered for sale. All such lands shall, with the exception of section "number sixteen," which shall be reserved in each township, for the support of the schools within the same . . . [Emphasis ours].
Therefore, when Louisiana was admitted into the Union in 1812, the reserved sixteenth sections in such townships vested in the state. The legislature delegated the power to maintain and dispose of the reserved sections to the respective school boards. La. R.S. 41:631-981. The school boards did not acquire the reserved land in their own right; they are mere custodians of the property. Therefore, it is our opinion that the state owns the sixteenth section land at issue.
The basic rule that section sixteen in each township is reserved for the support of the schools within the township is complicated by the fact that Louisiana's parishes were not created until after statehood and do not follow the rectangular system of surveys. The parish boundaries have been described along various natural boundaries, as well as section and township lines. Some parish boundaries follow the banks or centers of rivers, and others follow the sinuosities of lakeshores, bays and other naturally occurring points of division, as described by various survey techniques. Some parish boundaries follow natural boundaries, periodically interspersed by points and segments along section and township lines. In any event, some parishes fall within one or more townships or visa versa some townships lie within one (1) or more parishes, containing a sixteenth section or portions of a sixteenth section, which confuses distribution of proceeds derived from revenues from such sixteenth sections.
While the above discussion addresses ownership and location of the sixteenth sections, your primary concern is the proper distribution of proceeds received from the sale of sixteenth section timber. You suggest that two statutes appear to conflict with each other. La. R.S. 41:718 (1968) reads:
 A. In all cases of the lease of sixteenth section school lands, or of the sale of the timber thereon, the cash payment after deducting sufficient amount to cover the actual expenses incurred by the election and making the sale or lease, shall be credited to the account of the current school fund of the parish where the sixteenth section school lands are located.
Notes representing deferred payments shall be placed in the hands of the parish school treasurer for collection, and when collected also credited to the current school fund of the parish, to be used for general school purposes. [Emphasis added].
 B. The term "general school purposes" as used in the last sentence of the preceding part of this section shall include, but not be limited to, fencing, drainage, fire prevention, insect and pest eradication, reforestation and timber management of the sixteenth section from which the funds were derived.
 * * *
The seemingly conflicting provision, La. R.S. 41:640
(1983), reads:
 B. The parish school boards of parishes within which there lies a township or any portion of a township containing a sixteenth section or any portion of a sixteenth section shall be entitled to a portion of the proceeds derived from the sale of the sixteenth section or any portion thereof, including the sale of timber thereon . . . The proceeds and revenues thereof shall be credited to the parish school boards in which such townships are situated in proportion to the percentage of the townships lying in each parish. [Emphasis ours].
You ask for our opinion as to which of the above statutes control the distribution of timber proceeds, and we note that La. R.S. 41:640 received the latest amendment in 1983, and is thus the latest expression of legislative intent. To aid in interpreting the two statutes, we referred to Louisiana Civil Code Art. 8 (1993), which reads:
 Laws are repealed, either entirely or partially, by other laws. A repeal may be express or implied. It is express when it is literally declared by a subsequent law. It is implied when the new law contains provisions that are contrary to, or irreconcilable with, those of the former law. The repeal of a repealing law does not revive the first law.
We recognize that repealing a statute by implication is not favored. National Bank of Commerce in New Orleans v. Board ofSup'rs of La. State University and Agricultural and MechanicalCollege, 206 La. 913, 20 So. 2d 264 (1945). Only when there is an irreconcilable conflict between two statutes will a former statute be repealed by implication. State v. Standard Oil Co. of Louisiana,188 La. 978, 178 So. 601 (1938).
Knowing this, we have attempted to reconcile Section 640 and Section 718 so as to avoid any conflict between them and any presumed repeal by implication. As will be discussed below, it is our opinion that Section 640, rather than 718, provides for the distribution of funds derived from timber sales.
We believe that the legislature intended Section 718 to clarify the "use" of the proceeds derived from sales of timber and school lands, that being "general school purposes", such as fencing, drainage, fire prevention, insect and pest eradication, reforestation and timber management of the sixteenth section from which the funds were derived, as defined by subsection (B). Additionally, it has previously been suggested by this office that Section 718 applies when only one school board is entitled to the proceeds, whereas Section 640 applies when multiple school boards must share the proceeds. La. A.G. Opinion No. 82-886.
Historically, Section 718 (formerly Section 2962), directed the proceeds to be credited to the "township," just as Section 640 so provides today. Louisiana Acts 1908, No. 129 reads:
 In all cases of the lease of sixteenth section school land, or of the sale of the timber thereon or of the lease or sale of oil and mineral rights thereof, the cash payment, after deducting sufficient amount to cover the actual expenses incurred by the said election and making the said sale or lease, shall at once transmitted to the State Auditor to be credited to the township in which the property is situated, . . . [Emphasis ours].
However, the Act failed to clarify and define the "use" of the potential proceeds. Therefore, Section 718 (formerly Section 2962) was subsequently amended and reenacted until eventually an additional subsection (B) was added to clarify that some of the funds remained with the sixteenth section, for its maintenance and improvements, as discussed above, pages 2 and 3.
Subsection (B), read together with La. R.S. 41:718(A), supra, directs timber and school land proceeds be used for "general school purposes," such as fencing, drainage, . . . Defining the use insures that at least some of the funds derived from both surface leases and timber sales will be returned to maintain and improve that sixteenth section of land. La. A.G. Opinion No. 81-1214.
Therefore, it is our opinion that Section 718 directs how the proceeds are to be used, whereas Section 640 directs how the proceeds are to be distributed. Because the two statutes are reconcilable, neither are repealed by implication.
However, if we viewed Section 718 and Section 640 as conflicting with each other, the outcome would remain the same. Such a conflict necessarily begins when the two statutes first existed simultaneously. In 1921, Section 640 was originally enacted as a Constitutional provision. La. Const. Art. XII, Section 18 (1921). As such, Section 640 effectively superseded Section 718 because a constitutional provision prevails over a statute.
In 1968, Section 718 was amended and reenacted. Even so, it still contravened Section 640 (La. Const. Art. 12, Section 18) of the 1921 Constitution, and would therefore still be unconstitutional. La. A.G. Opinion No. 77-1062. As a result of the enactment of the Louisiana Constitution of 1974, the Constitutional provision was removed and the Legislature carried Section 640 forward as a statute.
As you can see, whether you view Section 718 and Section 640 as conflicting or not, the result is the same. Section 640 governs the distribution of revenues received from the sale of timber on sixteenth section land. It requires the Allen Parish School Board and the Rapides Parish School Board to proportionately share the revenues according to the percentage of the township lying in each parish. In this case, the percentages were given to us by the Allen Parish School Board. Assuming these percentages to be correct, 75.05% of the proceeds go to the Allen Parish School Board and 24.95% of the proceeds go to the Rapides Parish School Board. La. A.G. Opinion No. 91-270.
Next, you ask for the proper procedures for selling timber on sixteenth section land. There are presently statutory provisions which govern the sale of timber on sixteenth section land, as follows:
 (1) La. R.S. 17:87, para. 2, provides that: All elections to authorize the sale of sixteenth section lands, or of timber on sixteenth section lands, shall be conducted by the parish school boards, and the funds realized from such sale, after deducting for necessary expenses connected with such elections, shall be promptly forwarded to the state auditor for credit to the proper township.
 (2) La. R.S. 41:717(A) provides that: The parish school boards may sell the timber on sixteenth section school lands to the highest bidder for said timber, after public notice of the proposed timber sale has been given by advertisement for at least thirty days in the official journal of the parish. In the case of sixteenth sections located in townships which extend into two parishes, such timber sales shall be made by the joint action of the school boards of the two parishes, after public notice, as above provided, in the official journals of both parishes.
By Act 374 of 1956, the Louisiana Legislature amended and re-enacted Section 717 of Title 41 and removed the requirements for an election, providing the specific provisions quoted in para. (2), above, to control the sale of timber from sixteenth section school lands by parish school boards. As stated, the procedure is for the parish school board to sell the timber to the highest bidder after public notice by advertisement for at least thirty (30) days in the official journal of the parish. While the Legislature clarified the language of La. R.S. 41:717
by Act 374 of 1956, it did not clarify the language of La. R.S.41:718 or La. R.S. 17:87 or reconcile these latter two (2) provisions with La. R.S. 41:717, which is the latest expression of legislative intent and which we find to be controlling.
Therefore, the historic requirement of an election for the sale of timber has clearly been deleted by the Legislature as of 1956 by allowing the school boards the authority to decide whether there should be such a sale, and, if so, to follow the procedures provided in the statute discussed.
If a sixteenth section is located in a township which encompasses two parishes, both parishes must conduct the sale of timber, as prescribed by La. R.S. 41:717.
Your last inquiry is whether the Rapides Parish School Board can ratify an improper sale of timber, thereby making the sale valid? Our answer to this question is in the negative, as La. R.S. 41:717, discussed above, clearly requires that in the case of sixteenth sections located in townships which extend into two (2) parishes, timber sales must be conducted by the joint action of the school boards of the two (2) parishes after public notice. Therefore, if there was an improper sale it may not be ratified except insofar as this might be done by a re-advertisement and sale.
We note in your request that you have stated that the Allen Parish School Board has declared the land as surplus, and advertised and bid the timber out. Actually, there is no necessity to follow such procedures, which apparently took place pursuant to La. R.S. 17:87.6, which does not deal with sixteenth section land. Sixteenth section land cannot be disposed of under that procedure as specifically stated in La. R.S. 41:891, since title is vested in the State of Louisiana. Therefore, a school board may not declare sixteenth sections as surplus property and authorize a sale.
Sixteenth section lands can only be sold with the concurrence with the State after a vote of the people of the township pursuant to La. R.S. 41:711 and 41:712.
We hope this information is of assistance to you and if we may be of further help, please advise us.
Yours very truly,
 RICHARD P. IEYOUB Attorney General
RPI/GLK/JMM/bb
OPINION NUMBER 94-234 Don J. Higginbotham Attorney General of Louisiana — Opinion. June 8, 1994
97 — Schools School Districts — Property, Contracts, etc.
Titles to sixteenth section lands is vested in the State; and the State, by action of the Legislature, may alienate these lands in order to carry out the purpose of the dedication. Meyer vs. State,121 So. 604 (La. 1929).
The Legislature may authorize a local parish school board to exchange only certain parcels of sixteenth section lands for other designated parcels to be utilized for public school purpose, or it may grant a local parish school board general authority to exchange sixteenth section lands that are no longer needed for school purposes for other land of comparable value.
La. R.S. 41:894, 895.
ROBERT H. CARPENTER, JR.
Honorable Don J. Higginbotham State Representative, District 43 P.O. Box 94062 Baton Rouge, LA 70804
Dear Representative Higginbotham:
You have requested an opinion of this office as to whether a school board can "legally trade Section 16 Land"? For purposes of this opinion, we shall assume that the transaction you have in mind would be classified as an exchange.
Title to sixteenth section lands is vested in the State for the support of public schools; and the State, by action of the Legislature, is empowered to alienate these sixteenth section lands in such a manner as to carry out the purpose of the dedication. Meyer vs. State, 121 So. 604 (La. 1929).
It is the opinion of this office that the Legislature may either grant a local parish school board general authority to exchange sixteenth section lands that are no longer needed for school purposes for other land of comparable value, or it may limit the authority of a local parish school board to exchange only certain parcels of sixteenth section lands for other designated parcels to be utilized for public school purposes.
Our research reveals only one instance where the Legislature has granted a local parish school board general authority to exchange sixteenth section lands that are no longer needed for school purposes for other land of comparable value. See: La. R.S. 41:895.
It appears that the Legislature usually limits the authority of a local parish school board to exchange sixteenth section lands to those situations where a particular transaction is contemplated. For instance, La. R.S. 41:894 authorizes the Grant Parish School Board to exchange a certain sixteenth section parcel for other lands in Grant Parish owned by the Forest Service of the U.S. Department of Agriculture. Also, Act 405 of 1962 provided for the State to transfer title to a fractional sixteenth section to the City of New Orleans, and further authorized the City of New Orleans to convey another tract to the Orleans Parish School Board for public school purposes. See:State ex rel. Jefferson Parish School Board v. City Park ImprovementAssociation, 345 So.2d 597 (La.App. 4th Cir. 1977).
If you have any further questions concerning this request or if it does not adequately address the matter that you have raised, please do not hesitate to contact our office.
Very truly yours,
 RICHARD P. IEYOUB ATTORNEY GENERAL